**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X

| | |
|---|---|
| TORISHA JACK, JULIUS RICHMOND, KELIA : | **INDEX NO.** |
| RICHMOND, a minor, by her father JULIUS : | **ECF CASE** |
| RICHMOND, ANTUONE THOMPSON, : | |

**JURY TRIAL DEMANDED**

Plaintiffs,

- against -

**COMPLAINT**

THE CITY OF NEW YORK, a municipal entity,
and NEW YORK CITY POLICE OFFICERS
"JOHN DOES 1-15"

Defendants.

**SCANLON, M.J.**

------------------------------------------------------------------X

Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, a minor, by her father JULIUS RICHMOND, and ANTUONE THOMPSON, by their attorneys, STECKLOW COHEN & THOMPSON, complaining of the defendants, respectfully allege as follows:

## I. PRELMINARY STATEMENT

1.    Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, a minor, by her father JULIUS RICHMOND, and ANTUONE THOMPSON bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.    On the evening of March 12, 2011, Plaintiffs TORISHA JACK, JULIUS RICHMOND and KELIA RICHMOND were in their home in Brooklyn, New York ("Plaintiffs' Home"). TORISHA JACK was preparing to attend a baby shower later that evening with family friend and Plaintiff ANTUONE THOMPSON. As Plaintiffs TORISHA JACK, JULIUS RICHMOND, and KELIA RICHMOND were present in various rooms within Plaintiffs' Home, Plaintiff ANTUONE THOMPSON was making his way back from a nearby corner store, where he had purchased supplies to wrap his

1

and Plaintiff TORISHA JACK's shower present. As Plaintiff ANTUONE THOMPSON was walking up the stairs of the building leading up to Plaintiffs' Home, he heard heavy footsteps behind him. Shortly after entering Plaintiffs' Home, he saw a metal baton sticking between the front door of Plaintiffs' home and its corresponding frame. Moments later, two of the Defendant "John Doe" POLICE OFFICERS, brandishing weapons and pepper spray, entered Plaintiffs' Home.

3.　　　Thereafter, the Defendant "John Doe" POLICE OFFICERS would eventually, amongst other conduct: strike Plaintiff ANTUONE THOMPSON with a metal baton; pepper spray Plaintiffs ANTUONE THOMPSON, KELIA RICHMOND, and JULIUS RICHMOND; and hold Plaintiff JULIUS RICHMOND at gunpoint in the presence of his daughter, Plaintiff KELIA RICHMOND, who begged the officers not to kill her father at gunpoint. After calling for back-up, but not before 8-10 additional "John Doe" POLICE OFFICERS entered Plaintiffs' Home, the Defendant "John Doe" POLICE OFFICERS cursed at Plaintiffs on multiple occasions, threatened Plaintiffs, and double-handcuffed and arrested Plaintiff ANTUONE THOMPSON.

4.　　　Upon discovering a lack of controlled substances in Plaintiffs' Home, one or more of the Defendant "John Doe" POLICE OFFICERS falsified and/or "planted" evidence in the alleged possession of Plaintiff ANTUONE THOMPSON.　All charges against Plaintiff ANTUONE THOMPSON were subsequently dismissed. As a direct result of the trauma, embarrassment and humiliation suffered in this incident, Plaintiffs TORISHA JACK, JULIUS RICHMOND and KELIA RICHMOND would later move to a residence in East New York, not for convenience, but solely to lessen the likelihood of suffering another like incident with police officers.　Plaintiffs now bring this action in a quest for answers as to why their home was invaded and their civil rights were violated by Defendants.

## II. JURISDICTION

5.　　　This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

6.　　　Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON further invoke this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

7.　　　Venue is proper for the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because, *inter alia*, the events pled herein substantially occurred in this district.

## IV. JURY DEMAND

**8.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, a minor, by her father JULIUS RICHMOND, and ANTUONE THOMPSON respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

**9.** Plaintiff TORISHA JACK is an American citizen and is currently a resident of Brooklyn, New York.

**10.** Plaintiff KELIA RICHMOND is an American citizen and is currently a resident of Brooklyn, New York.

**11.** Plaintiff ANTUONE THOMPSON is an American citizen and is currently a resident of Brooklyn, New York.

**12.** Plaintiff JULIUS RICHMOND has permanent resident status in America and is currently a resident of Brooklyn, New York.

**13.** Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

**14.** Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, CITY OF NEW YORK.

**15.** Defendant "John Doe I" POLICE OFFICER was Asian, stood about 5'8" tall, was of regular build, and was wearing a police uniform and "Mohawk" or "Faux-Hawk[1]" hairstyle on the date of the incident and arrest in question.

**16.** Defendant "John Doe II" POLICE OFFICER was Caucasian, stood about 6'0" tall, and was wearing a police uniform on the date of the incident and arrest in question.

**17.** On information and belief, Defendant "John Doe II" POLICE OFFICER was a sergeant in the New York City Police Department ("NYPD").

**18.** That at all times hereinafter mentioned, the Defendant New York City Police Officers "John Does 1-10") (individually, "Defendant OFFICER JOHN DOE ___"; collectively, "Defendant OFFICERS JOHN DOES 1-10"), were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

**19.** That at all times relevant to this action, Defendant OFFICERS JOHN DOES 1-15, (collectively, "Defendant POLICE OFFICERS"), either personally or through their employees, were acting under color of state law and/or in compliance with the official

[1] On information and belief, a hairstyle wherein the center of one's hair is sculpted to a straight ridge peak from front to back, reminiscent of a Mohawk, but without concommittant shaving of the sides of the hair, is referred to as a "Faux-Hawk."

3

rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

**20.** Each and all of the acts of the Defendant "John Doe" POLICE OFFICERS alleged herein were done by said defendants while acting within the scope of their employment by Defendant THE CITY OF NEW YORK.

**21.** Each and all of the acts of the Defendant "John Doe" POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance of their employment by defendant THE CITY OF NEW YORK.

**22.** A New York City Police Department ("NYPD") "POLICE OFFICER DANIEL DELPINO, SHIELD NO. 11853" of the 77th Precinct is listed in arrest paperwork for Plaintiff ANTUONE THOMPSON as Plaintiff ANTUONE THOMPSON's arresting officer.

**23.** However, due to the NYPD's policy of "Turnover Arrests," codified at NYPD Patrol Guide section PG 208-20, Plaintiffs are uncertain whether "POLICE OFFICER DANIEL DELPINO, SHIELD NO. 11853" of the 77th Precinct played any role in the incident described herein.

**24.** Plaintiffs will amend this pleading to properly name the Defendant Police Officers as their identities are ascertained.

## VI. FACTS COMMON TO ALL CLAIMS

**25.** The events described herein took place on and after Saturday, March 12, 2011.

**26.** On the evening of Saturday March 12, 2011, at or around 10:00pm, Plaintiffs TORISHA JACK, JULIUS RICHMOND and KELIA RICHMOND, (collectively, "The Jack Family") were present at 1566 Sterling Place, Brooklyn, New York, in the private residence apartment they shared therein ("Plaintiffs' Home").

**27.** At or around this time, Plaintiff TORISHA JACK was getting ready to go to a family friend's baby shower with family friend and Plaintiff ANTUONE THOMPSON.

**28.** At or around this time, Plaintiff ANTUONE THOMPSON was returning to Plaintiffs' Home from a corner store where he had bought necessaries for his and Plaintiff TORISHA JACK's shower gift.

### ANTUONE THOMSPON RETURNS TO PLAINTIFF'S HOME SHORTLY BEFORE DEFENDANT "JOHN DOE" POLICE OFFICERS ENTER THE SAME

**29.** At or around the time that Plaintiffs TORISHA JACK, JULIUS RICHMOND, and KELIA RICHMOND were present in various rooms within Plaintiffs' Home, Plaintiff ANTUONE THOMPSON was walking up the stairs of the apartment complex leading to Plaintiffs' Home.

**30.** At or around this time, as Plaintiff ANTUONE THOMPSON was walking up the stairs to Plaintiffs' HOME, he heard footsteps following him quickly up the same stairway.

**31.** Plaintiff ANTUONE THOMPSON did not hear anyone address him at this time.

**32.** Plaintiff ANTUONE THOMPSON continued moving up the stairs and entered the hallway leading to Plaintiffs' Home.

**33.** Shortly thereafter, Plaintiff ANTUONE THOMPSON entered the living room of Plaintiffs' Home and attempted to close the door behind him.

**34.** At or around this time, Plaintiff TORISHA JACK was present in the living room of Plaintiffs' Home.

**35.** Shortly thereafter, Plaintiff ANTUONE THOMPSON and Plaintiff TORISHA JACK observed a metal baton sticking in the front door way of Plaintiffs' Home that prevented Plaintiff ANTUONE THOMPSON from closing the door behind him.

**36.** At or around this time, Plaintiff ANTUONE THOMPSON heard one or more voices from the other side of the door state, in sum and substance, "Get back, move away from the door, get back."

**37.** Shortly thereafter, Plaintiff ANTUONE THOMPSON, having observed the metal baton sticking in the doorway, surmised that the two voices from the other side of the door might be police officers.

**38.** Desiring to comply with all orders and instructions of police officers, Plaintiff ANTUONE THOMPSON moved away from the door.

**39.** Shortly thereafter, Defendant "John Doe I" POLICE OFFICER entered Plaintiffs' Home just before Defendant "John Doe II" POLICE OFFICER did the same.

**40.** The Defendant "John Doe" POLICE OFFICERS did not knock on the door of Plaintiffs' Home.

**41.** The Defendant "John Doe" POLICE OFFICERS did not announce that they were police officers.

**42.** The Defendant "John Doe" POLICE OFFICERS did not ask to come in to Plaintiffs' Home.

**43.** The Defendant "John Doe" POLICE OFFICERS did not produce a warrant to search Plaintiffs' Home.

**44.** The Defendant "John Doe" POLICE OFFICERS did not produce a warrant to arrest any person present at Plaintiffs' Home.

**45.** The Defendant "John Doe" POLICE OFFICERS did not produce a "no-knock" warrant to search Plaintiffs' Home.

**46.** The Defendant "John Doe" POLICE OFFICERS did not produce a "no-knock" warrant to arrest any person present at Plaintiffs' Home.

**47.** The Defendant "John Doe" POLICE OFFICERS did not state that they possessed a warrant to enter Plaintiffs' Home that would allow them to enter without knocking.

**48.** On information and belief, no exigent circumstances existed to justify the Defendant "John Doe" POLICE OFFICERS' entry into Plaintiffs' Home.

**49.** Shortly after Defendant "John Doe" POLICE OFFICERS' entry into Plaintiffs' Home, Defendant "John Doe II" began swinging the aforementioned metal baton.

**50.** Defendant "John Doe II" POLICE OFFICER's first swing of the metal baton caused the metal baton to hit and dent a wall near the door of Plaintiffs' Home.

**51.** Defendant "John Doe II" POLICE OFFICER's second swing of the metal baton caused the metal baton to strike the underside of Plaintiff ANTUONE THOMPSON's right knee.

**52.** Defendant "John Doe II" POLICE OFFICER's striking of Plaintiff ANTUONE THOMPSON's knee caused him to suffer continuing pain for weeks after the incident and arrest in question, and a lasting scar or mark to present.

**53.** At no point before Defendant "John Doe II" POLICE OFFICER used a metal baton to strike Plaintiff ANTUONE THOMPSON had Plaintiff ANTUONE THOMPSON raised his voice or used offensive language toward the Defendant "John Doe" POLICE OFFICERS.

**54.** At no point before Defendant "John Doe II" POLICE OFFICER used a metal baton to strike Plaintiff ANTUONE THOMPSON had Plaintiff ANTUONE THOMPSON lunged toward, swung at, or in any way threatened to use force against the Defendant "John Doe" POLICE OFFICERS.

**55.** Defendant "John Doe II" POLICE OFFICER had no legitimate or legally cognizable reason for striking Plaintiff ANTUONE THOMPSON.

**56.** Shortly after Defendant "John Doe II" POLICE OFFICER struck Plaintiff ANTUONE THOMPSON with a metal baton, Plaintiff ANTUONE THOMPSON stumbled back, away from Defendant "John Doe II" POLICE OFFICER.

**57.** At or around this time, Plaintiff ANTUONE THOMPSON asked the Defendant "John Doe" POLICE OFFICERS then present, in sum and substance, "What's going on, why are you all doing this?"

**58.** As Plaintiffs ANTUONE THOMPSON was asking this question, Defendant "John Doe I" POLICE OFFICER began backing Plaintiff ANTUONE THOMPSON back toward the bedroom of Plaintiffs' Home then occupied by Plaintiff KELIA RICHMOND ("kids' room").

**59.** At or around this time, Defendant "John Doe I" POLICE OFFICER began spraying pepper spray in a wide dispersal in Plaintiffs' Home.

**60.** At or around this time, Plaintiff KELIA RICHMOND was present in the kids' room of Plaintiffs' Home.

**61.** At or around this time, Plaintiff ANTUONE THOMPSON, still being approached, without explanation but with clear threat of continuing physical force, by Defendant "John Doe I" POLICE OFFICER, entered the kids' room of Plaintiffs' Home.

**62.** Plaintiff ANTUONE THOMPSON experienced pain and discomfort as a result of the pepper spray that was indiscriminately sprayed by Defendant "John Doe I" POLICE OFFICER.

**63.** Shortly thereafter, Defendant "John Doe I" POLICE OFFICER entered the kids' room of Plaintiffs' Home.

**64.** At no point prior to Defendant "John Doe I" POLICE OFFICER's act of pepper spraying toward Plaintiff ANTUONE THOMPSON raised his voice or used offensive language toward the Defendant "John Doe" POLICE OFFICERS.

**65.** At no point prior to Defendant "John Doe I" POLICE OFFICER's act of pepper spraying toward Plaintiff ANTUONE THOMPSON had Plaintiff lunged toward, swung at, or in any way threatened to use force against the Defendant "John Doe I" POLICE OFFICERS.

**66.** Defendant "John Doe I" POLICE OFFICER had no legitimate or legally cognizable reason to pepper spray Plaintiff ANTUONE THOMPSON.

### PLAINTIFF TORISHA JACK WAKES UP PLAINTIFF JULIUS RICHMOND, AND THE DEFENDANT "JOHN DOE" POLICE OFFICERS PEPPER SPRAY AND HOLD PLAINTFF JULIUS RICHMOND AT GUNPOINT

**67.** Plaintiff JULIUS RICHMOND is the father of Plaintiff KELIA RICHMOND.

**68.** At the time of the incident giving rise to this action, Plaintiff KELIA RICHMOND was thirteen (13) years old.

**69.** Plaintiff JULIUS RICHMOND is the stepfather of Plaintiff TORISHA JACK.

**70.** At the time when the incident giving rise to this action began, Plaintiff JULIUS RICHMOND was sleeping in the second bedroom of the Plaintiffs' Home ("parents' room").

**71.** Plaintiff JULIUS RICHMOND was not planning on attending the aforementioned baby shower that evening.

**72.** Shortly after the incident giving rise to this action began, Plaintiff TORISHA JACK left the living room of the Plaintiffs' Home and went into the parents' room of the Plaintiffs' Home.

**73.** At or around this time, Plaintiff TORISHA JACK woke up Plaintiff JULIUS RICHMOND.

**74.** Plaintiff TORISHA JACK informed Plaintiff JULIUS RICHMOND that police were in Plaintiffs' Home.

**75.** Plaintiff JULIUS RICHMOND got out of his bed and walked toward the hallway within Plaintiffs' Home.

**76.** Plaintiff JULIUS RICHMOND was in his boxer shorts at this time.

**77.** Shortly thereafter, while still in his boxers, Plaintiff JULIUS RICHMOND observed Defendant "John Doe I" POLICE OFFICER standing near the doorway to the kids' room of Plaintiff's Home and Defendant "John Doe II" POLICE OFFICER standing near the front door of Plaintiffs' Home.

**78.** At or around this time, Plaintiff JULIUS RICHMOND asked Defendant "John Doe II" POLICE OFFICER, in sum and substance, "What seems to be the problem, why are you all in my house?"

**79.** In response, Defendant "John Doe II" POLICE OFFICER stated, in sum and substance, "Get the hell back."

**80.** At or around this time, Plaintiff KELIA RICHMOND left the kids' room of the Plaintiffs' Home and entered the living room of the same.

**81.** Shortly thereafter, Defendant "John Doe II" POLICE OFFICER raised the same aforementioned metal baton with his left hand and simultaneously used his right hand to pepper spray Plaintiff JULIUS RICHMOND from a distance of several feet in a wide spray pattern.

**82.** Plaintiff JULIUS RICHMOND experienced pain and discomfort as a result of the pepper spray.

**83.** Plaintiff KELIA RICHMOND experienced pain and discomfort as a result of the pepper spray.

**84.** At or around this time, Defendant "John Doe II" POLICE OFFICER called for back up.

**85.** At or around this time, Plaintiff JULIUS RICHMOND — standing within his own home with his hands in the air and in his boxers — again asked Defendant "John Doe II" POLICE OFFICER, in sum and substance, "What are you all doing in my house?"

**86.** At or around this time, Plaintiff JULIUS RICHMOND began wiping his eyes in an attempt to get the pepper spray that Defendant "John Doe II" POLICE OFFICER had used against him out of his eyes.

**87.** At or around this time, Plaintiff JULIUS RICHMOND, still attempting to get the pepper spray out of his eyes, walked toward the door of Plaintiffs' Home in order to again ask Defendant "John Doe II" POLICE OFFICER, in sum and substance, "Why are you all in my house?"

**88.** Shortly thereafter, Defendant "John Doe II" POLICE OFFICER pointed a gun at Plaintiff JULIUS RICHMOND's chest and re-stated, in sum and substance, "Get the hell back."

**89.** Plaintiff JULIUS RICHMOND was terrified, hurt and embarrassed by Defendant "John Doe II" POLICE OFFICER's act of pointing a gun at him.

**90.** Plaintiff JULIUS RICHMOND was terrified, hurt and embarrassed as a result of

the Defendant "John Doe" POLICE OFFICERS' act of rushing into Plaintiffs' home while Plaintiff JULIUS RICHMOND was sleeping.

**91.** At or around this time, Defendant "John Doe I" POLICE OFFICER instructed Plaintiff ANTUONE THOMPSON lay on one of the beds in the kids' room of Plaintiffs' Home.

**92.** Plaintiff ANTUONE THOMPSON complied.

**93.** At or around this time, 13 year old Plaintiff KELIA RICHMOND stood in front of her father, Plaintiff JULIUS RICHMOND —— who Defendant "John Doe II" had held at gun point, —— and pleaded with Defendant "John Doe II" POLICE OFFICER, begging, in sum and substance, "Stop. What are you all doing here? Leave."

**94.** At or around this time, 13 year old Plaintiff KELIA RICHMOND pleaded with Defendant "John Doe II" POLICE OFFICER, begging, in sum and substance, "Don't kill my father."

**95.** At or around this time, despite 13 year old Plaintiff KELIA RICHMOND's plea, Defendant "John Doe II" POLICE OFFICER continued pointing his gun at Plaintiff JULIUS RICHMOND.

**96.** Plaintiff KELIA RICHMOND was hurt and embarrassed as a result of seeing her father held at gunpoint.

**97.** At or around this time, Plaintiff KELIA RICHMOND began crying.

**98.** At or around this time, Plaintiff JULIUS RICHMOND began moving back and away from Defendant "John Doe II" POLICE OFFICER.

## DEFENDANT "JOHN DOE" POLICE OFFICERS
## ARREST PLAINTIFF ANTUONE THOMPSON

**99.** At or around the time that Defendant "John Doe II" POLICE OFFICER had Plaintiff JULIUS RICHMOND held at gunpoint in the living room of the Plaintiffs' Home, Defendant "John Doe I" POLICE OFFICER began moving closer toward Plaintiff ANTUONE THOMPSON while the two were standing in ANTUONE THOMPSON's bedroom.

**100.** At or around this time, Plaintiff ANTUONE THOMPSON observed Defendant "John Doe II", with his gun, drawn moving past the kids' bedroom of Plaintiffs' Home.

**101.** Shortly thereafter, Plaintiff ANTUONE THOMPSON asked Defendant "John Doe I" POLICE OFFICER, in sum and substance, "What are you doing, why are you arresting me?"

**102.** Defendant "John Doe I" POLICE OFFICER did not verbally respond to Plaintiff ANTUONE THOMPSON, but instead, continued moving closer to Plaintiff ANTUONE THOMPSON.

**103.** Shortly thereafter, Defendant "John Doe I" POLICE OFFICER double handcuffed and arrested Plaintiff ANTUONE THOMPSON.

**104.** Upon information and belief, Defendant "John Doe I" POLICE OFFICER did not verbally respond to Plaintiff ANTUONE THOMPSON's question because neither Defendant "John Doe I" POLICE OFFICER nor Defendant "John Doe II" POLICE OFFICER had a valid or legal reason to arrest Plaintiff ANTUONE THOMPSON.

**105.** Upon information and belief, Defendant "John Doe I" POLICE OFFICER did not verbally respond to Plaintiff ANTUONE THOMPSON's question because neither Defendant "John Doe I" POLICE OFFICER nor Defendant "John Doe II" POLICE OFFICER had a cognizable basis for arresting Plaintiff ANTUONE THOMPSON.

### APPROXIMATELY TEN ADDDITIONAL "JOHN DOE" POLICE OFFICERS ARRIVE AT PLAINTIFFS' HOME AND WALK PLAINTIFF ANTUONE THOMPSON OUT OF THE SAME

**106.** At or around the time that Defendant "John Doe I" POLICE OFFICER handcuffed Plaintiff ANTUONE THOMPSON, approximately ten Defendant "John Doe" POLICE OFFICERS arrived at Plaintiffs' Home.

**107.** Shortly thereafter, at least five of the Defendant "John Doe" POLICE OFFICERS who had recently-arrived at Plaintiffs' Home entered the same.

**108.** Shortly thereafter, several of the same Defendant "John Doe" POLICE OFFICERS entered the kids' room of Plaintiffs' Home.

**109.** At no point before, during, or after one or more of the Defendant "John Doe" POLICE OFFICERS' act of double-cuffing Plaintiff ANTUONE THOMPSON did any of the individual Defendant "John Doe" POLICE OFFICERS in any way attempt to prevent, stop, or otherwise obstruct the participating Defendant "John Doe" POLICE OFFICER(S) from doing the same.

**110.** At or around this time, one or more of the Defendant "John Doe" POLICE OFFICERS walked Plaintiff ANTUONE THOMPSON, presently double-cuffed and recently pepper sprayed, out of the Plaintiffs' Home and into the hallway outside of the same.

**111.** At or around this time, Plaintiff ANTUONE THOMPSON again asked one or more of the Defendant "John Doe" POLICE OFFICERS, in sum and substance, "What is going on, why am I being arrested?"

**112.** In response, one of the Defendant "John Doe" POLICE OFFICERS punched Plaintiff ANTUONE THOMPSON in his groin.

**113.** In response, one of the Defendant "John Doe" POLICE OFFICERS threw Plaintiff ANTUONE THOMPSON to the ground.

**114.** At no point before, during, or after the same Defendant "John Doe" POLICE OFFICERS' act of punching Plaintiff ANTUONE THOMPSON in his groin did any of the individual Defendant "John Doe" POLICE OFFICERS in any way attempt to prevent, stop, or otherwise obstruct the same Defendant "John Doe" POLICE OFFICER from striking Plaintiff ANTUONE THOMPSON.

**115.** One of the Defendant "John Doe" POLICE OFFICERS then present in the hallway outside of Plaintiff's home was a white-shirted supervisory officer.

**116.** Said supervisory Defendant "John Doe" POLICE OFFICER observed these excessive applications of force against the handcuffed Plaintiff ANTUONE THOMPSON, and did not intervene on his behalf.

**117.** At or around this time, Plaintiff JULIUS RICHMOND, recently-released from being held at gunpoint and having observed the Defendant "John Doe" POLICE OFFICERS' collective act of arresting and walking Plaintiff ANTUONE THOMPSON out of the Plaintiffs' Home, walked out of the Plaintiffs' Home and stood in the hallway outside of the same.

**118.** Shortly thereafter, Plaintiff JULIUS RICHMOND repeatedly asked one or more of the Defendant "John Doe" POLICE OFFICERS, in sum and substance, "Why are you arresting ANTUONE THOMPSON?"

**119.** In response, one or more of the Defendant "John Doe" POLICE OFFICERS repeatedly stated, in sum and substance, "Shut the fuck up. Get back inside the apartment and close the door."

**120.** At or around this time, the Defendant "John Doe" POLICE OFFICERS transported Plaintiff ANTUONE THOMPSON to the 77th Precinct.

**121.** Following these events, Plaintiff ANTUONE THOMPSON was charged with Criminal Possession of Marijuana in the 5th Degree, unlawful possession of Marijuana, Obstruction of Governmental Administration, and Resisting Arrest.

**122.** Following multiple subsequent court appearances, Plaintiff ANTUONE THOMPSON received an adjournment in contemplation of dismissal for all charges against him.

**123.** The charges against Plaintiff ANTUONE THOMPSON have been dismissed and sealed.

**124.** Upon information and belief, the Defendant "John Doe" POLICE OFFICERS arrested Plaintiff ANTUONE THOMPSON, as a result of the Defendant "John Doe" POLICE OFFICERS' attempt to meet the New York Police Department's quantitative enforcement productivity goals, i.e., arrest quotas.

**125.** Upon information and belief, the Defendant "John Doe" POLICE OFFICERS' act of falsely alleging that a quantity of marijuana was recovered from Plaintiff ANTUONE THOMPSON was an act of "Flaking", a common practice of the Defendant CITY of NEW YORK'S POLICE DEPARTMENT in which police officers "plant" artificial or actual controlled substances on innocent people such as Plaintiff ANTUONE THOMPSON in order to support arrests.

**126.** Upon information and belief, the Defendant "John Doe" POLICE OFFICERS employed "flaking" tactics to help meet quantitative enforcement productivity goals, i.e., arrest quotas, promulgated by Defendant CITY OF NEW YORK.

**127.** Further information regarding the existence of the aforesaid constitutionally-violative policies and practices, Defendant CITY OF NEW YORK's knowledge of same and Defendant CITY OF NEW YORK's failures to address same are set forth in the appendix to this complaint.

**128.** At the time of the March 12th, 2011 Brooklyn, New York incident and arrest of Plaintiff ANTUONE THOMPSON by the Defendant "John Doe" POLICE OFFICERS, not one of the Plaintiffs had a warrant out for his or her arrest.

**129.** At the time of the March 12th, 2011 Brooklyn, New York incident and arrest of Plaintiff ANTUONE THOMPSON by the Defendant "John Doe" POLICE OFFICERS, not one of the Plaintiffs was in possession of a weapon of any sort.

**130.** At the time of the March 12th, 2011 Brooklyn, New York incident and arrest of Plaintiff ANTUONE THOMPSON by the Defendant "John Doe" POLICE OFFICERS not one of the Plaintiffs was in possession of a controlled substance of any sort.

**131.** At the time of the March 12th, 2011 Brooklyn, New York incident and arrest of Plaintiff ANTUONE THOMPSON by the Defendant "John Doe" POLICE OFFICERS, not one of the Plaintiffs was engaged in any illegal activity of any kind.

**132.** Following these events, Plaintiffs TORISHA JACK, JULIUS RICHMOND and KELIA RICHMOND moved from Plaintiffs' Home to an apartment in East New York, neither for convenience nor in order to satisfy any other desire to relocate, but to avoid further contact with the police.

**133.** As a result of the foregoing, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON sustained, inter alia, mental injuries, emotional distress, embarrassment, loss of property, damage of property, humiliation, and deprivation of their constitutional rights.

**134.** As a result of Defendants' impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON demand judgment against Defendants in a sum of money to be determined at trial.

---

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

**135.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON repeat, reiterate and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**136.** All of the aforementioned acts of the Defendant CITY, and the Defendant "John

Doe" POLICE OFFICERS and their agents, servants and employees, were carried out under the color of state law.

**137.** All of the aforementioned acts deprived Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

**138.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

**139.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

**140.** The Defendant "John Doe" POLICE OFFICERS, and Defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**141.** As a result of the above constitutionally impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and loss of wages, and damage to their reputations and standings within their communities.

**142.** As a result of Defendants' impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON demand judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

**143.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**144.** As a result of the aforesaid conduct by Defendant "John Doe" POLICE OFFICERS, Plaintiff ANTUONE THOMPSON was subjected to illegal, improper and false arrest by the Defendant "John Doe" POLICE OFFICERS and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

**145.** As a result of the above constitutionally impermissible conduct, Plaintiff ANTUONE THOMPSON was caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages and damage to his reputation and standing within his community.

**146.** As a result of Defendants' impermissible conduct, Plaintiffs ANTUONE THOMPSON demands judgment against Defendants in a sum of money to be determined at trial.

### THIRD CLAIM FOR RELIEF
### EXCESSIVE USE OF FORCE UNDER 42 U.S.C. §1983

**147.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**148.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were unnecessarily pepper sprayed by the Defendant "John Doe" POLICE OFFICERS.

**149.** The Defendant "John Doe" POLICE OFFICERS utilized excessive force in holding Plaintiff JULIUS RICHMOND at gunpoint.

**150.** The Defendant "John Doe" POLICE OFFICERS utilized excessive force in holding Plaintiff KELIA RICHMOND at gunpoint.

**151.** The Defendant "John Doe" POLICE OFFICERS utilized excessive force in striking Plaintiff ANTUONE THOMPSON with a metal baton.

**152.** The Defendant "John Doe" POLICE OFFICERS utilized excessive force in striking the wall of Plaintiffs' Home with a metal baton.

**153.** The Defendant "John Doe" POLICE OFFICERS utilized excessive force in double-handcuffing Plaintiff ANTUONE THOMPSON.

**154.** The Defendant "John Doe" POLICE OFFICERS utilized excessive force in striking Plaintiff ANTUONE THOMPSON.

**155.** The Defendant "John Doe" POLICE OFFICERS utilized excessive force in holding Plaintiff JULIUS RICHMOND at gunpoint.

**156.** Plaintiff ANTUONE THOMPSON was transported to the 77th Precinct by the Defendant "John Doe" POLICE OFFICERS in the absence of probable cause for his arrest.

**157.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON residence, Plaintiffs' home in Brooklyn, New York was excessively searched, damaged, and rummaged through by the Defendant "John Doe" POLICE OFFICERS in the absence of probable cause to search the residence.

**158.** Plaintiffs TORISHA JACK'S, JULIUS RICHMOND's, KELIA RICHMOND's, and ANTUONE THOMPSON's personal property within their residence, Plaintiffs' Home Brooklyn, New York was excessively searched, damaged, and rummaged through by the Defendant "John Doe" POLICE OFFICERS in the absence of probable cause to search the residence.

**159.** The circumstances presented to the Defendant "John Doe" POLICE OFFICERS at that time did not support any of the above applications of force on Plaintiffs TORISHA JACK, KELIA RICHMOND, ANTUONE THOMPSON, and JULIUS RICHMOND.

**160.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were subjected to excessive force and were assaulted by the Defendant "John Doe" POLICE OFFICERS, in violation of their rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

**161.** As a result of the above constitutionally impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, and damage to their reputations and standings within their communities.

**162.** As a result of Defendants' impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON demand judgment against Defendants in a sum of money to be determined at trial.

### FOURTH CLAIM FOR RELIEF
### FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

**163.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**164.** The Defendant "John Doe" POLICE OFFICERS, and Defendant CITY OF NEW YORK had an affirmative duty to intervene on the Plaintiffs behalf to prevent the violation of their constitutional rights.

**165.** The Defendant "John Doe" POLICE OFFICERS failed to intervene on Plaintiffs TORISHA JACK'S, JULIUS RICHMOND's, KELIA RICHMOND's, and ANTUONE THOMPSON's behalf in order to prevent the violation of their constitutional rights despite having had a realistic opportunity to do so.

**166.** The Defendant "John Doe" POLICE OFFICERS failed to intervene on Plaintiffs TORISHA JACK'S, JULIUS RICHMOND's, KELIA RICHMOND's, and ANTUONE THOMPSON's behalf in order to prevent the violation of their constitutional rights despite having substantially contributed to the circumstances within which the Plaintiffs' rights were violated by their affirmative conduct.

**167.** The Defendant "John Doe" POLICE OFFICERS failed to intervene on Plaintiffs TORISHA JACK'S, JULIUS RICHMOND's, KELIA RICHMOND's, and ANTUONE THOMPSON's behalf in order to prevent the violation of their constitutional rights despite their awareness that their rights were being violated.

**168.** As a result of the aforementioned conduct of the individual defendants, Plaintiffs TORISHA JACK'S, JULIUS RICHMOND's, KELIA RICHMOND's, and ANTUONE THOMPSON's constitutional rights were violated.

**169.** As a result of the above constitutionally impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, and damage to their reputations and standings within their communities.

**170.** As a result of Defendants' impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON demand judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM
## UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. §1983

**171.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**172.** Plaintiffs also incorporate herein by reference the contents of the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS."

**173.** Defendants arrested and incarcerated ANTUONE THOMPSON in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrests and incarcerations would jeopardize the Plaintiffs' liberty, wellbeing, safety, and constitutional rights.

**174.** The acts complained of were carried out by the aforementioned Defendant "John Doe" POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

**175.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

**176.** The aforementioned customs, policies, usages, practices, procedures and rules of

the CITY OF NEW YORK and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

a) wrongfully arresting individuals without probable cause due to perceived lack of respect for the police officer (i.e., "contempt of cop" arrests);

b) wrongfully arresting individuals without probable cause in attempts to justify excessive uses of force (i.e. "contempt of cop" "cover charge" arrests; condoning brutality);

c) wrongfully arresting innocent persons in order to meet quantitative "productivity goals" (i.e., arrest quotas).

d) wrongfully arresting persons without probable cause due to perceived lack of respect for the police officer; in order to teach a lesson in respect while also satisfying quantitative "productivity goals" (i.e., "contempt of cop" arrests used to satisfy arrest quotas).

e) wrongfully "planting" both artificial as well as actual controlled substances in the possession of innocent persons to support the arrests of such persons (i.e., "flaking" arrests).

**177.** The particular arrest of Plaintiff ANTUONE THOMPSON is believed to have been motivated in whole or in part by the aforesaid custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, obstruction of governmental administration, and possession of small amounts of artificial or actual "planted" controlled substances for personal vindication and/or as pretexts to justify use of force, and/or to justify punitive false arrests because the Plaintiff ANTUONE THOMPSON arrest was undertaken in the absence of probable cause to arrest.

**178.** The particular arrest of the Plaintiff ANTUONE THOMPSON is believed to have been motivated in whole or in part by the aforesaid custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, obstruction of governmental administration, and possession of small amounts of artificial or actual "planted" controlled substances for personal vindication and/or as pretexts to justify use of force, and/or to justify punitive false arrests because they were undertaken in a manner which indicated that the individual Defendant "John Doe" POLICE OFFICERS who participated in the Plaintiff's arrest made the determination to arrest Plaintiff ANTUONE THOMPSON following their act of "planting" possession of small amounts of artificial or actual controlled substances on the Plaintiff ANTUONE THOMPSON.

**179.** The particular arrests of the Plaintiffs are believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy, in that the Defendant "John Doe" POLICE OFFICERS forcibly entered and searched Plaintiffs' Home, found nothing illegal therein, then arrested the five Plaintiffs and others on evidence that was in fact recovered from a separate individual outside of Plaintiffs' Home.

**180.** As a result of the aforementioned conduct of the Defendant CITY OF NEW YORK and the individual defendants, Plaintiffs TORISHA JACK'S, JULIUS RICHMOND's, KELIA RICHMOND's, and ANTUONE THOMPSON's constitutional rights were violated.

**181.** As a result of the above constitutionally impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages and damage to their reputations and standings within their communities.

**182.** As a result of Defendants' impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON demand judgment against Defendants in a sum of money to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM**
**THE MUNICIPAL DEFENDANTS' PROMULGATION OF**
**UNCONSTITUTIONAL ARREST QUOTAS UNDER 42 U.S.C. §1983**

**183.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**184.** Plaintiffs also incorporate herein by reference the contents of the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS."

**185.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**186.** Upon information and belief, the arrests of Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were motivated wholly by the Defendant "John Doe" POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

**187.** Upon information and belief, the arrests of Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were motivated in part by the Defendant "John Doe" POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

**188.** Upon information and belief, the arrests of Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were motivated wholly by the Defendant "John Doe" POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff

18

of Defendant CITY OF NEW YORK's police department.

**189.** Upon information and belief, the arrests of Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were motivated in part by the Defendant "John Doe" POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

**190.** The particular arrests of Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON are believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because they were undertaken in the absence of probable cause to arrest.

**191.** As a result of the aforementioned conduct of the Defendant CITY OF NEW YORK, the Defendant "John Doe" POLICE OFFICERS, Plaintiffs TORISHA JACK'S, JULIUS RICHMOND's, KELIA RICHMOND's, and ANTUONE THOMPSON's constitutional rights were violated.

**192.** As a result of the above constitutionally impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, and damage to their reputations and standings within their communities.

**193.** As a result of Defendants' impermissible conduct, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON demand judgment against Defendants in a sum of money to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
### EQUAL PROTECTION UNDER 42 U.S.C. § 1983

**194.** Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**195.** Plaintiffs also incorporate herein by reference the contents of the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS."

**196.** At all times described herein, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were possessed of the right to equal protection under the laws, as guaranteed under the 14th Amendment to the United States Constitution.

**197.** The Defendant "John Doe" POLICE OFFICERS arrested and incarcerated Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrests and incarcerations would jeopardize the Plaintiffs' liberty, well-being, safety and constitutional rights.

**198.** The acts complained of were carried out by the Defendant "John Doe" POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

**199.** The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

**200.** The Plaintiffs were falsely accused of crimes and violations and were taken into Police custody and detained against their wills.

**201.** That the actions of the Defendant "John Doe" POLICE OFFICERS, heretofore described, constituted unlawful detention, imprisonment, assault, and battery and were designed to and did cause mental harm, pain, and suffering both in violation of Plaintiffs TORISHA JACK'S, JULIUS RICHMOND's, KELIA RICHMOND's, and ANTUONE THOMPSON's Constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for the Plaintiffs exercise of their civil and constitutional rights of free, free expressive association as guaranteed by the Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

**202.** On March 1, 2010, the New York Times published an Op-Ed piece entitled "Watching Certain People," wherein the author cited to New York City Police Department Statistics showing that of the 2,798461 stops made by police officers during the years 2004 through 2009, African-American men accounted for 1,444,559 of those stops, and Hispanics accounted for 843,817 of those stops, or 51.6 percent and 30.1 percent, respectively. The vast majority of those stopped, 88.2 percent, were not guilty of any crime.[2]

**203.** On February 22, 2011, the New York Daily News published an article citing New York Police Department stops for the year 2010, which numbered 601,055. This figure marked a 4.3 percent increase from the year 2009, and African-American and Latino men accounted for approximately 85 percent of all stops.[3]

**204.** The particular arrests of Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON are believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of

---

[2] Herbert, Robert, "Watching Certain People," New York Times, March 1, 2010Seattle Post-Intelligencer, February 28, 2008. Article incorporated herein by reference and available online at: http://www.nytimes.com/2010/03/02/opinion/02herbert.html?scp=7&sq=police%20stop%20frisk%20africa n%20american%20men&st=cse

[3] Parascandola, Rocco, "New York Police Department Stopped More than 600,000 in 2010, the Highest Number Ever Recorded, February 22, 2011. Article incorporated herein by reference and available online at: http://articles.nydailynews.com/2011-02-22/news/29442269_1_latino-men-fight-crime-new-yorkers

hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals.

**205.** The particular arrests of Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON are believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals, because the Defendant "Jon Does" POLICE OFFICERS, informed the Plaintiffs they were being arrested after the Defendant "John Doe" POLICE OFFICERS had "planted" both artificial and actual controlled substances on the Plaintiffs who were otherwise not carrying any weapons or illegal substances, and did not have any outstanding warrants against them.

**206.** The Defendant "John Doe" POLICE OFFICERS through their actions carried out a discriminatory application of such laws, driven by a discriminatory motivation of what might otherwise be facially neutral statutes due to a perceived ease of prosecution.

**207.** As a result of the aforementioned conduct, the Defendants "John Doe" POLICE OFFICERS, have violated the Plaintiffs' constitutional rights to equal protection, and Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON are entitled to seek redress under 42 U.S.C. §1983, and are further entitled to injunctive relief to the extent necessary to prevent further disparate treatment and retaliation.

**208.** The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON as alleged herein.

**209.** The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON as alleged herein.

**210.** As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were subjected to excessive force, false arrest, and excessive and unnecessary detention.

**211.** As a result of the foregoing, Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON were caused to suffer personal

injuries, violations of their civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses, and damage to their reputations and standings within their communities.

**212.** As a result of the foregoing, the Plaintiffs TORISHA JACK, JULIUS RICHMOND, KELIA RICHMOND, and ANTUONE THOMPSON demand judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:      New York, New York
             October 23, 2012


Respectfully submitted,

SAMUEL B. COHEN [SC 0622]
STECKLOW COHEN & THOMPSON
10 SPRING STREET – SUITE 1
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
SAM@WYLIELAW.COM
ATTORNEYS FOR PLAINTIFFS

## APPENDIX: ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS

### "CONTEMPT OF COP" AND "COVER CHARGE" ARRESTS

    **1.**    On information and belief, Defendant CITY OF NEW YORK has had notice of, and tacitly condoned, its police officers' proffering of pretextual and false charges for personal vindication and/or to putatively justify improper uses of force against civilians.

    **2.**    In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

    **3.**    On February 28, 2008, the Seattle Post-Intelligencer published an investigative review of six (6) years of Seattle Municipal Court files, wherein the Post-Intelligencer's investigators found that African-Americans in that predominantly Caucasian city were arrested solely on charges of "obstructing a public officer" and related crimes such as resisting arrest eight times as often as Caucasians.[4]

    **4.**    The Seattle Post-Intelligencer's investigative review cited above also found that the Seattle City Attorney's Office dropped nearly half of all Seattle criminal cases predicated solely on charges of "obstructing a public officer" and related crimes such as resisting arrest between January 2002 and 2008. *See* fn4.

    **5.**    In response to Seattle police officers' questionable arrest activities discussed above, "Leo Poort, the [Seattle Police] department's legal adviser, included warnings about obstruction arrests in... his top twelve (12) tips to officers for 'avoiding civil liability lawsuits.' 'Don't arrest for 'contempt' of cop,' he wrote in tip No. 3. 'Officers must be thick skinned and not unduly influenced by the attitudes of persons they contact. Flunking the 'attitude' test (is) not a bookable offense.'" *See* fn4.

    **6.**    In a review of San Jose criminal cases published on October 31, 2009, the San Jose Mercury News reported that the Santa Clara County Prosecutor declined to prosecute over one-third (33.33...%) of resisting arrest cases brought by San Jose police,

---

[4] Nalder, Kamb and Lathrop, "Blacks Are Arrested on 'Contempt of Cop' Charge at Higher Rate," Seattle Post-Intelligencer, February 28, 2008. Article incorporated herein by reference and available online at http://www.seattlepi.com/local/353020_obstructmain28.asp

a rate that is markedly disproportionate to the Santa Clara County Prosecutor's general twenty percent (20%) decline-to-prosecute rate.[5]

7.    The San Jose Mercury News investigation cited above also found that the San Jose Police Department did not sustain or substantiate civilian complaints with respect to any of the ninety-nine (99) use-of-force cases that it reviewed in 2008, even though the San Jose Independent Police Auditor disagreed with police findings in twenty-five (25) of those 99 cases. *See* fn5.

8.    In response to the San Jose Mercury News investigation cited above, the San Jose Police Department instituted a new policy of tracking arrests where it appears that resisting arrest is being used as a cover charge to justify unnecessary and excessive police uses of force on civilians. *See* fn5.

9.    A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City police officers noted that at that time, Defendant City of New York did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest.[6]

10.    November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City police officers noted that at that time, Defendant City of New York did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest, despite considerable anecdotal evidence that New York City POLICE OFFICERS were arresting individuals on those and other like charges to justify use of force and/or to punish those individuals for "contempt of cop." *See* fn5.

11.    The above-cited New York Times special report noted that Los Angeles had already instituted a system for tracking the initiation and dispositions of "contempt of cop" and "cover charge" charges such as resisting arrest and disorderly conduct as of the time of that article's publication in 1997. *See* fn5.

12.    Upon information and belief, the "contempt of cop" and "cover charge" charges levied most regularly by New York City POLICE OFFICERS are disorderly conduct, resisting arrest and obstruction of governmental administration.

13.    Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and

---

[5] Webby, Sean, "Mercury News investigation: San Jose police often use force in resisting-arrest cases," San Jose Mercury News, October 31, 2009. Article incorporated by reference herein and available online at http://www.mercurynews.com/top-stories/ci_13686438?nclick_check=1

[6] Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report.; Disrespect as Catalyst for Brutality," New York Times, November 19, 1997. Article incorporated by reference herein and available online at http://query.nytimes.com/gst/fullpage.html?res=9807E7D9163BF93AA25752C1A961958260&scp=8&sq=contempt+of+cop&st=cse&pagewanted=all

charges arising from alleged possession of small amounts of artificial or actual "planted" controlled substances are relatively easy for police to levy in the absence of actual probable cause because they may arise out of nearly any police-civilian interactions.

**14.**    Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and charges arising from alleged possession of small amounts of controlled substances are relatively easy for police to levy in the absence of actual probable cause because they can be levied solely upon the allegations of the arresting officer(s) without reference to physical evidence (save evidence of controlled substances "planted" by the arresting officers) or witness observation of criminal acts.

**15.**    Upon information and belief, to date, Defendant City of New York has not implemented any particular, training, oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and charges arising from alleged possession of small amounts of artificial or actual "planted" controlled substances.

**16.**    Upon information and belief, and despite due and repeated notice that New York City POLICE OFFICERS have an ongoing custom or practice of charging individuals with crimes and violations for personal vindication and/or as pretexts to justify use of force, to date, Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" charges.

**17.**    Upon information and belief, and despite due and repeated notice that New York City POLICE OFFICERS have an ongoing custom or practice of charging individuals with crimes and violations as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date, Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" charges.

**18.**    Upon information and belief, and despite due and repeated notice that New York City POLICE OFFICERS such as the Defendant POLICE OFFICERS have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, obstruction of governmental administration, and possession of small amounts of artificial or actual "planted" controlled substances as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant City of New York has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, obstruction of governmental administration, and possession of small amounts of artificial or actual "planted" controlled substances.

## THE PRACTICE AND CUSTOM OF THE NEW YORK CITY POLICE DEPARTMENT OF PERMITTING ITS OFFICERS TO ENGAGE IN POLICE BRUTALITY AND USE OF EXCESSIVE FORCE

19.    On information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons and persons' property.

20.    In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

21.    On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen Commission Report," "The Report").[7]

22.    The Mollen Commission Report was subtitled "ANATOMY OF FAILURE: A PATH FOR SUCCESS." The Report at page before "i."

23.    The July 7, 1994 Mollen Commission Report was prepared for and at the request of the Defendant City of New York, and therefore knowledge of its contents may be imputed to Defendant City of New York.

24.    The Mollen Commission Report found that police officers commonly covered up their fellow officers' misconduct, including but not limited to excessive applications of force against civilians, in accordance with a custom or practice known as a "code of silence" or "Blue Wall of Silence.

25.    The above-referred custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence" was discussed at length on pages 53-59 of the July 7, 1994 Mollen Commission Report.

26.    One police officer who testified before the Mollen Commission explained that the code of silence "...starts in the Police Academy, and it just develops from there.... It starts with the instructors telling you never to be a rat, never give up your fellow officer. It starts with other recruits telling you they'll never give you up, and it just goes down the line as you go... into a precinct." The Report at 55.

---

[7] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York. Incorporated by reference herein and available online at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

27.     Another officer who testified before the Mollen Commission stated that "[c]ops don't tell on cops. And if they did tell on them, just say if a cop decided to tell on me, his career's ruined. He's going to be labeled as a rat.... he's going to have nobody to work with. And chances are if it comes down to it... [the whistleblower's fellow officers are] going to let him get hurt." The Report at 53-54.

28.     A third officer who testified before the Mollen Commission concurred, stating: "[i]f you're labeled a rat... you're going to have a difficult time for the remainder of your career.... [i]t was something that you couldn't shake." Id. at 54.

29.     An NYPD lieutenant who testified before the Mollen Commission confirmed that officers are at times "ostracized" for breaking the code of silence. Id.

30.     An NYPD captain who disciplined his subordinates for misconduct and reported allegations of corruption to NYPD Internal Affairs explained to the Mollen Commission that he had been transferred to thirty-eight (38) different commands in the course of his career, and in almost every case "he found evidence that his reputation had preceded him. At one command, his locker was burned; at another, his car tires were slashed; at another, he received threats of physical harm." Id.

31.     The *Mollen Commission Report* explicitly identified police brutality, including "implicit or explicit threat[s] of physical harm[,]" and official tolerance thereof, as critical issues that must be investigated by "any Commission investigating police corruption." Id. at 44.

32.     The *Mollen Commission* went on to fault the NYPD's intelligence gathering regarding incidents of brutality as "wholly inadequate." Id. at 45.

33.     The *Mollen Commission* found that "[police b]rutality is... used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

34.     One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance. It's not simply giving a beating. It's the other officers begin [sic] to accept you more." Id.

35.     The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence.... [b]ecause a complaint usually comes down to an officer's word (and often the word of fellow officer witnesses) against the... [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse." The Report at 49.

36.     As of the July 7, 1994 *Mollen Commission Report*, Defendant City of New York had notice that the officers and commanders of the New York City Police Department tolerated and encouraged police to lie to cover up the wrongful conduct of themselves

and their fellow officers, including brutal conduct like that which was perpetrated by Defendant "John Doe" POLICE OFFICERS upon Plaintiffs.

37.    On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the custom or practice of officers employing excessive force against civilians.

38.    On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

39.    The failure of Defendant CITY OF NEW YORK to meaningfully address these issues was underscored when the non-governmental organization Human Rights Watch conducted a study examining common obstacles to accountability for police abuse in fourteen large cities, including Atlanta, Boston, Chicago, Detroit, Indianapolis, Los Angeles, Minneapolis, New Orleans, New York, Philadelphia, Portland, Providence, San Francisco, and Washington, D.C.[8]

40.    Research for this report was conducted over two and a half years, from late 1995 through early 1998. See fn8.

41.    The report stated: "The barriers to accountability are remarkably similar from city to city. Shortcomings in recruitment, training, and management are common to all. So is the fact that officers who repeatedly commit human rights violations tend to be a small minority who taint entire police departments but are protected, routinely, by the silence of their fellow officers and by flawed systems of reporting, oversight, and accountability. Another pervasive shortcoming is the scarcity of meaningful information about trends in abuse; data are also lacking regarding the police departments' response to those incidents and their plans or actions to prevent brutality. Where data do exist, there is no evidence that police administrators or, where relevant, prosecutors, utilize available information in a way to deter abuse." See Id.

42.    The report documented that the official response of the New York City Police Department and the City of New York, to credible, persistent reports of abuse was to deny the existence of the problem. See Id.

43.    The report documented that the New York City Police Department, and the City of New York failed to discipline officers in all but 1% of incidents in which complaints were filed with the Civilian Complaint Review Board. See Id.

---

[8] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998. Report incorporated by reference herein and available online at http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspohtml/toc.htm.

**44.**    Upon information and belief, the report was presented to Mayor Rudy Giuliani of the City of New York.

**45.**    Upon information and belief, the Mayor denounced the report without reading it.

**46.**    Upon information and belief, Kenneth Roth, then Executive Director Human Rights Watch wrote in an open letter to the Mayor on July 14, 1998: "Rather than engage in a serious discussion of the problem of police brutality in New York City, you attacked those who raised the issue -- apparently without even reading the advance copy of the report we had sent you."

**47.**    Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force, but has failed to take action to remedy the problem.

**48.**    That the Defendant City of New York continued to have notice after 1994 that the officers and commanders of the New York City Police Department continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:

a.    **Ariza v. City of New York**, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers.... [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]

b.    **White-Ruiz v. City of New York**, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996) ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department"]

c.    **United States v. Rosario**, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ["[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997."]

d.    **Barry v. New York City Police Dep't**, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence.... Plaintiff complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report."]

    e.  **Griffin v. City of New York et al.**, 10-CV-01824 (E.D.N.Y. 2010) [Plaintiff detective sues on pattern of retaliation following his reporting fellow detective to Internal Affairs, fellow officers cover for detective accused of misconduct, see, e.g., at ¶35: "Internal Affairs conducted its investigation into [Detective] Plaintiff's allegations [of misconduct] against [Detective] McCarthy. All of the material witnesses failed to cooperate with the investigation by being less than truthful…. [a]s a result, the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated."]

**49.**  Upon information and belief, the above-referred constitutionally violative policies, practices and customs remain widespread, open, and notorious throughout the NYPD to date.

**50.**  Upon information and belief, the policymakers of the NYPD and Defendant City of New York are aware that these practices and customs of NYPD officers continue to date, and have failed to take adequate steps to curb these practices and customs, which regularly cause the violation of citizens Constitutional rights.

**51.**  Defendant City of New York has failed to meaningfully curb these Constitutionally-violative customs and practices to date.

**52.**  In the introduction to the Mollen Commission Report, it is noted that "the [Internal Affairs] system designed to protect the [New York City Police] Department from corruption minimized the likelihood of uncovering it." The Report at 3.

**53.**  The Mollen Commission Report explained that at that time, the Internal Affairs Division (re-named the Internal Affairs Bureau in a 1993 restructuring) attempted "to close cases with as little effort as possible…. One officer told us they sit around and 'eat donuts and do crossword puzzles' -- and the supervisors and commanders did little more…. an anonymous survey of the work conditions and attitudes of IAD investigators… revealed that almost half of IAD investigators' time was spent on non-investigatory matters -- and more of their 'investigative' work was done without ever leaving their office…. The facts confirmed IAD's do-nothing reputation." The Report at 85

**54.**  Since the Mollen Commission Report was published in 1994, the number of complaints of police corruption and other misconduct logged annually by NYPD Internal Affairs has nearly quadrupled, rising from 14,789 logs received in 1994 to 44,994 logs received in 2006, the last year for which NYPD reporting is available. *NYPD Internal Affairs 2006 Annual Report*, 12-13.[9]

---

[9] 1993-2006 Internal Affairs Reports available online at http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports.

**55.**  Over that same time period, the number of corruption and other police misconduct complaints investigated annually by NYPD Internal Affairs has fallen by more than half, from 2,258 investigations in 1994 to 1057 investigations in 2006. *Id.*

**56.**  More up-to-date information relating to these customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department is available in "THE PRICE OF BRUTALITY: A special report.; Police Complaints Settled, Rarely Resolved." *The New York Times*, September 17, 1997.[10]

**57.**  Upon information and belief, the steady decline in investigations by NYPD Internal Affairs since the publication of the Mollen Commission Report is representative of a return to a "business-as-usual" mentality with respect to police corruption and brutality within the NYPD.

**58.**  Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively fulfilling its mandate of policing NYPD corruption and brutality generally.

**59.**  Upon information and belief, Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively curbing the established and widespread customs and practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

**60.**  Defendant City of New York has also had notice that the New York City Civilian Complaint Review Board ("CCRB") has not been effective in curbing the above-referred practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

**61.**  This is not a new phenomenon; in Sango v. New York, 1989 U.S. Dist. LEXIS 18214, 40-41 (S.D.N.Y. June 19, 1989), the court found that CCRB investigations into police misconduct were so grossly inadequate that "their predictable results could have led… officers to believe that their conduct, no matter how improper, would go unpunished."

**62.**  That Defendant City of New York had knowledge of its continuing failure to abate the above-referred practices and customs can be shown with reference to the following facts reported to the City in the *2006 Annual Report* of the CCRB:[11]

---

[10] Sontag, Deborah & Barry, Dan, *The New York Times*, Sept. 17, 1997 available online at http://www.nytimes.com/1997/09/17/.../price-brutality-special-report-police-complaints-settled-rarely-resolved.hmtl.

[11] 2001-2010 CCRB Reports available online at http://www.nyc.gov/html/ccrb/html/reports.html.

    a.  Only 12,059 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 received full investigations. *CCRB 2006 Annual Report*, 93.

    b.  Only 1,441 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 resulted in a finding of even one substantiated allegation. *Id.*

    c.  The NYPD either took no disciplinary action whatsoever or merely issued instructions in 1,062 of the 1,918 cases of CCRB-substantiated police misconduct closed by the department between 2002 and 2006. Some of these cases had been forwarded to the NYPD by the CCRB before 2002. *Id.* at 101.

    d.  In the five years between 2002 and 2006 only one (1) NYPD officer was subject to employment termination as a result of allegations of misconduct substantiated by the CCRB. *Id.* at 100.

    e.  The CCRB substantiated only 3.5% of the excessive force allegations reported between 2002 and 2006. *Id.* at 95.

**63.**  The New York Civil Liberties Union report on the CCRB's activities between 1994 and 2006, entitled "Mission Failure: Civilian Review of Policing in New York City 1994-2006" ("NYCLU Report")[12] reviewed, collated and summarized information from the CCRB's Annual Reports and other sources, resulting in the following findings:

    a.  CCRB complaint data indicates that serious police misconduct, including improper threats and use of force, occurs with significant frequency, with allegations of excessive force in half of all complaints filed with the CCRB. NYCLU Report at 4.

    b.  The NYPD takes no disciplinary action whatsoever against nearly 30% of officers named in substantiated CCRB complaints, and gave only "instructions" to nearly a third of officers who were disciplined following substantiated CCRB complaints between 2000 and 2005. Id. at 5.

    c.  "In recent years it appears that the NYPD has adopted a radically more lenient disciplinary standard as regards acts of police misconduct directed at civilians. In 2004 the police department ordered instructions in approximately 30 percent of all disciplinary actions related to a substantiated CCRB complaint. In 2005 instructions represented nearly 60 percent of such disciplinary actions; and in 2006 instructions rose to 72 percent of all disciplinary actions related to police misconduct directed at civilians. Suspension of a police officer has become an extraordinarily rare occurrence, even when egregious acts of misconduct are involved." Id. at 6.

---

[12] Available online at http://www.nyclu.org/files/ccrb_failing_report_090507.pdf.

**64.**    In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

**65.**    In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the Defendant City of New York knew or should have known that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

**66.**    The policy of failure to screen, discipline, supervise, counsel, transfer, control, and correct unconstitutional patterns or conditions, is evidenced, *inter alia*, by the cases and reports cited above.

**67.**    Upon information and belief, Defendant, CITY OF NEW YORK, and the New York City Police Department failed to effectively screen, train, supervise and discipline its police officers, including, but not limited to, Defendant "John Doe" POLICE OFFICERS, as demonstrated by their propensity for group violence, including excessive use of force and restraint, and for their failure to protect citizens from unconstitutional conduct of other police officers.

**68.**    Upon information and belief, Defendant CITY OF NEW YORK, failed to put into place and otherwise maintained an inadequate structure for risk containment and stress management relative to its police officers. *Inter alia*, the structure was deficient at the time of pre-selection and selection to evaluation and exchange within the command structure about the performance of individual police officers; to the training of supervisory personnel to effectively and adequately evaluate performance of an officer; and to otherwise put the command structure on notice that an individual was at significant levels of risk to the public at large or to specific segments thereof.

**69.**    The net effect of these deficiencies and failures was to permit police officers of the New York City Police Department to function at levels of significant and substantial risk to the public.

**70.**    Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality, choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

**71.**    Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

**72.**    Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

## UNCONSTITUTIONAL ARREST QUOTAS ILLEGALLY IMPLEMENTED BY THE NEW YORK CITY POLICE DEPARTMENT

**73.**    Upon information and belief, police officers in the New York City Police Department, including the Defendant "John Doe" POLICE OFFICERS, are trained, ordered or encouraged to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

**74.**    Said quantitative enforcement "productivity goals" can also be referred to as arrest quotas.

**75.**    The need to meet arrest quotas can induce police officers to make arrests in the absence of probable cause.

**76.**    Upon information and belief, the arrest quotas promulgated by Defendant CITY OF NEW YORK induce New York City police officers, such as the Defendant "John Doe" POLICE OFFICERS herein, to make arrests in the absence of probable cause, in violation of the constitutional rights of individuals to be free from unreasonable seizures.

**77.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy was confirmed as a finding of fact when, on February 18, 2011, the jury in *Bryant v. City of New York*, Kings County Supreme Court Docket #022011/2007, found that the plaintiff in that case's arrest had resulted from a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest" imposed by Defendant City of New York.

**78.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may additionally be inferred from repeated occurrences of similar wrongful conduct, as documented in lawsuits including but not limited to the following civil rights actions filed against the City of New York:

- *Alvin Williams v. The City of New York et al.*, United States District Court, Southern District of New York, 05 CV 4013.

- *Corey Williams v. The City of New York et al.*, United States District Court, Eastern District of New York, 07 CV 5362.

**79.**    The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the admission by Deputy Commissioner Paul J. Browne, as

reported by the media on November 8, 2010, that commanders are permitted to set "productivity goals."[13]

**80.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn. *See* fn13.

**81.** Attached hereto as **Exhibit "A"** are copies of the quantitative target sheets obtained from the 77th Precinct by or on behalf of the New York Daily News, as referenced in the aforesaid November 8, 2010 New York Daily News article.

**82.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tapes recordings acquired by WABC-TV/DT, including, among other admissions, a 41st precinct sergeant explaining that each of his officers is held to a twenty summons per month and one arrest per month enforcement quota, as reported by the media on March 3, 2010.[14]

**83.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make "special" arrests as directed by their superiors even if they must void the arrests at the end of their shifts, as reported by the media on May 11, 2010.[15]

**84.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the full page color advertisement placed by the Patrolmen's Benevolent Association of the City of New York in the May 7, 2012 edition of the New York Daily News, which states "Don't Blame the Cop[,] Blame NYPD Management For the pressure to write summonses and the pressure to convict motorists[.] Because of ticket quotas, New York City police officers are being pressured to write summonses to as many motorists as possible.... " A reproduction of the advertisement in question is attached hereto as **Exhibit "B."**

**85.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred to have continued to the present date from the May 16, 2012 opinion granting class certification in *Floyd et al. v. The City of New York et al.*, SDNY 08-CV-1034 (SAS) [Document 206], in which the Honorable District Judge Shira A. Scheindlin noted the existence of a Police Officer Performance Objectives Operations Order dated October 17, 2011, in which "Commissioner Kelly directed all commands that 'Department managers **can** and **must** set performance goals,' relating to 'the issuance of summonses, the stopping and questioning of suspicious individuals, and the arrests of

---

[13] Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

[14] Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.

[15] Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town." Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

criminals.'" *Floyd* Document 206 at 18-19, citing 10/17/11 Police Officer Performance Objectives Operations Order. (emphasis in original).

## "FLAKING" AND "TESTILYING"

**86.** The July 7, 1994 *Mollen Commission Report* was prepared for and at the request of the Defendant City of New York, and therefore knowledge of its contents may be imputed to Defendant City of New York.

**87.** Among the species of police corruption explored in The Report, particular note was made of the practice of "testilying," or false testimony and falsification of records in connection with arrests. The Report at 36.

**88.** The Mollen Commission found "testilying" to be "probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns." Id.

**89.** The Mollen Commission explained that officers are particularly prone to engage in "testilying" with respect to said charges because "[t]he vast majority of charges for narcotics or weapons possession crimes result in pleas without the necessity of grand jury or trial testimony, thus obviating officers' concerns about the risk of detection and possible exposure to criminal charges of perjury." The Report at 37.

**90.** The Mollen Commission made particular note of "testilying" in an undisclosed unit of the NYPD's narcotics division, "where… [The Mollen Commission's] analysis of police records and intelligence sources indicated that the incidence of falsifications might run high." The Report at 38-39.

**91.** The Report continues: "While we cannot disclose the details of our investigation because we have referred the evidence to a prosecutor, the evidence suggests that certain officers in this unit falsified documents and may have committed testimonial perjury to conceal constitutional violations. Even more troubling, **the evidence suggests that the unit's commanding officer not only tolerated, but encouraged, this unlawful practice.**" The Report at 39 (emphasis added).

**92.** The practice of officers "testilying" with respect to narcotics charges continues in the NYPD to date.

**93.** Upon information and belief, the practice of officers "testilying" with respect to narcotics charges continues to be emploed with particular frequency by narcotics officers in Brooklyn and Queens.

**94.** In 2008, now-former NYPD undercover officer Steve Anderson was caught on video purchasing three bags of cocaine from an employee of a nightclub in Queens.[16]

---

[16] Jim Dwyer, "The Drugs? They Came From The Police," New York Times, October 13, 2011, incorporated by reference herein and available online at

**95.** Anderson did not arrest the person who sold the drugs to him. Id.

**96.** Instead, Anderson provided the drugs to then-fellow NYPD undercover officer Henry Tavarez. Id.

**97.** Tavarez then used the drugs to support the false arrests of four people. Id.

**98.** As a result of this and like incidents, prosecutors in Brooklyn and Queens have dismissed charges against approximately four hundred (400) individuals whose arrests were believed to have been tainted by the corrupt acts of NYPD officers. Id.

**99.** Another detective from the same unit, Jason Arbeeny, was recently convicted of various crimes in relation to his own 2007 conduct of planting a bag of crack cocaine in the car of a Coney Island couple to support narcotics charges against said couple.[17]

**100.** In that case, on November 1, 2011, "[b]efore announcing the verdict, Justice Reichbach scolded the department for what he described as a widespread culture of corruption endemic in its drug units. 'I thought I was not naïve,' he said. 'But even this court was shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed.'" Id.

**101.** Justice Reichbach continued: "Anything goes in the never-ending war on drugs... and a refusal to go along with questionable practices raise the specter of blacklisting and isolation." Id.

**102.** The practice of false drug arrests is colloquially referred to as "flaking."[18]

**103.** The particular arrest of Plaintiff ANTUONE THOMPSON is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because Plaintiff ANTUONE THOMPSON'S arrests were undertaken in the absence of probable cause to arrest.

**104.** The particular arrest of Plaintiff ANTUONE THOMPSON is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because it was undertaken in a manner which indicated that the individual Defendant Police Officers who participated in Plaintiff DWAYNE LESLIE's arrest made the determination to arrest Plaintiff ANTUONE THOMPSON for a marijuana offense when Plaintiff ANTUONE THOMPSON had been in possession of marijuana.

---

http://www.nytimes.com/2011/10/14/nyregion/those-drugs-they-came-from-the-police.html?ref=nyregion

[17] Tim Stellow, "Detective is Found Guilty of Planting Drugs," New York Times, November 1, 2011, incorporated by reference herein and available online at http://www.nytimes.com/2011/11/02/nyregion/brooklyn-detective-convicted-of-planting-drugs-on-innocent-people.html?_r=2&partner=rss&emc=rss

[18] Parascandola, Kappstatter, Doyle and Schapiro, "Cop Morale Low After String of NYPD Scandals Puts Department Under Fire," New York Daily News, October 23, 2011, incorporated by reference herein and available online at http://articles.nydailynews.com/2011-10-23/local/30329895_1_bronx-cop-internal-affairs-bureau-captains-endowment-association

**105.** The particular arrest of Plaintiff ANTUONE THOMPSON is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because it was undertaken in a manner which indicated that the individual Defendant Police Officers who participated in Plaintiff ANTUONE THOMPSON's arrest made the determination to arrest Plaintiff ANTUONE THOMPSON for a marijuana offense when Plaintiff ANTUONE THOMPSON had not been in possession of any drugs.

**106.** The particular arrest of Plaintiff ANTUONE THOMPSON is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because it was undertaken in a manner which indicated that the individual Defendant Police Officers who participated in Plaintiff ANTUONE THOMPSON's arrest falsely averred that Plaintiff ANTUONE THOMPSON had been observed in possession of marijuana in support of the prosecution of Plaintiff.


DATED:      New York, New York
            October 23, 2012




                        Respectfully submitted,


                        SAMUEL B. COHEN [SC 0622]
                        STECKLOW COHEN & THOMPSON
                        10 SPRING STREET – SUITE 1
                        New York, New York 10012
                        [212] 566-8000
                        [212] 202-4952/FAX
                        SAM@WYLIELAW.COM
                        ATTORNEYS FOR PLAINTIFF

**EXHIBIT A**

GOOD DAY WE NEED THE FOLLOWING FOR
THE WEEK: 4/5-4/11

CELLPHONE    60
SEATBELTS    50
DBL PKS.     65
BUS STOPS    40
TINTS        25
TRUCK RTES   2

PLEASE HAVE SUMMONS ISSUED AT APL'S:
ST JOHNS SCHENECTADY
UTICA/ST MARKS
EPKWY/WASHINGTON
PARK/VANDERBILT
EPKWY/ALBANY
*Please be advised these are new apl locations*

PLEASE ISSUE HANDICAPPED SUMMONS ON ALL TOURS

THANK YOU

10/18/10

FOR THE WEEK OF 10/18- 10/24 WE NEED:

DBL PKRS    25
BUS STOPS   15
SEATBLTS    50
CELLPHNS    75
TINTS        6
TRUCK RTE    5

Thank you,

EXHIBIT B



# Don't Blame the Cop

# Blame NYPD Management

### For the pressure to write summonses and the pressure to convict motorists

Because of ticket quotas, New York City police officers are being subjected to undue **pressure to write** summonses to as many motorists as possible. And for some reason, once the case gets to traffic court, they are being subjected to undue **pressure to convict** as many motorists as possible. In the first instance, the pressure comes in the form of lousy assignments, denial of transfer requests, unwanted transfers and other penalties. And in traffic court, where Internal Affairs supervisors are assigned for the sole purpose of punishing officers, the pressure comes from the risk of losing three vacation days — worth more than $900 — if the motorist is found not guilty. With all these pressures, the cop loses, the public loses and the traffic court justice system loses. The only winner may be the city's treasury, which collects either from the cop or the motorist.



**Patrolmen's Benevolent Association**
of the City of New York

125 Broad Street, 11th Floor, New York, NY 10004 • 212-233-5531

**Patrick J. Lynch, President**